Paul Reeds v. John Harbin Is that acceptable? Yes, you may do that. So, you'll start, and then you, and then you, and then you. That's complex, but I think we'll do it. Take turns. May it please the Court. Paul Reeds, Hicks, Fletcher, and Mack for the debtor, John Allen Harbin. Your Honor, and I'm here to address the issue of feasibility of the plan, because that is what is before the Court, and it's the only issue that could have brought this case to this point. In 2002, Mr. Harbin filed his bankruptcy. He was subject to a judgment for $414,000 in favor of Mr. Sherman. After the filing of his Chapter 7 bankruptcy, there was a declaratory relief judgment in the Superior Court that essentially took away personal liability for Mr. Harbin, and he moved to dismiss his Chapter 7 bankruptcy. Mr. Sherman objected. Mr. Harbin then converted the case to a case under Chapter 11 and proposed a plan that would reserve payment for Mr. Sherman in the event Mr. Sherman ever succeeded on appeal. Mr. Sherman objected and opposed the plan. During 2003, through a series of motions and hearings before the Bankruptcy Court in San Diego, there were three orders entered, all denying Mr. Sherman's claim, so that by December of 2003, as a matter of law, especially under the Rooker-Feldman Doctrine, there was no claim by Mr. Sherman against Mr. Harbin. There was a pending appeal, though, correct? There was, Your Honor. That's correct. So there's certainly a possibility of the jury's verdict being reinstated, and without saying anything about the merits of the previous case, those kinds of appeals where there is a jury verdict in someone's favor have a somewhat better chance to succeed than those that don't. Perhaps, Your Honor. So what about the pizza case? The pizza case. Your Honor, those are factually and legally different from this case for a couple of reasons. First of all, they didn't involve Rooker-Feldman. In essence, the Bankruptcy Court's hands were tied from reconsidering the case. There's a mechanism under the Bankruptcy Court. I don't understand the Rooker-Feldman argument, and it may just be my denseness, but it seems to me that it's almost 180 degrees opposite from Rooker-Feldman because what he was asking for, as I understood it, was to wait until the State court decided the case on appeal or to take account of the fact that that was a possibility that the State court might overturn what had been done. So what they were asking the court to do was to defer to the State court, enforce what the State court might do, not overturn it. There's a twist to that that may be unique to bankruptcy, Your Honor, and it's that the Bankruptcy Court ultimately has to get some kind of a plan of reorganization into place and that the other creditors aren't required to sit by, the debtor's not required to sit by, so it can confirm a plan. The plan is the seminal order of a bankruptcy case, and that will determine all the treatment of claims. There are a couple of specific mechanisms to deal with exactly this situation under the Bankruptcy Code, and that's estimation under Section 502C and reconsideration of claims under 502J. And he didn't ask for estimation. That's correct, Your Honor, and I think there's a real argument that they couldn't have because Rooker-Feldman under the Audrey case, which is a BAP case. That's probably why they didn't, so that's why I don't understand. In the posture it was, why it implicated Rooker-Feldman. Well, because you had a denied claim. And there's the Chrysler case from the Sixth Circuit, and it illustrates the reasoning that you can't require a debtor and other creditors to wait to be paid in full holding for a claim that, under federal law, can't be provided for because Rooker-Feldman gives effect to the state court judgment that said there's no individual liability from this debtor to Mr. Sherman. And so that plan, that bankruptcy plan, can't require the reservation for a creditor who doesn't have a loud claim on the day of confirmation. Now, there are mechanisms to get there. He could come in under 502J later, which is specifically reconsideration of disallowed claims. The code provides it. And the debtor didn't make this up. We took the law the way it came to us. On the day of confirmation, there was no claim that we could provide for. There was nothing we could do with it except pay the allowed claims, not pay the disallowed claims. And then post-confirmation, really what Mr. Sherman is concerned about, what he's upset about is the fact that the plan should have gone forward. It's the consequence to his claim. It's not the feasibility of the plan. This appeal was specious. He was concerned about his house, I gather, so that there would be enough left in the estate. If it was reconsidered, he could get paid in full. Is that correct? That is unclear, Your Honor, because they've taken a variety of positions through the underlying litigation as to exactly what that house would stand for. And frankly, it's an open issue. What was the value of the house? Was it $1.5 million? Is that right? Your Honor, when we came in, we had an appraisal at $800,000. The court had it appraised, appointed an independent appraiser. So at confirmation, it was $1,250,000. I don't know where it is today. The market has gone up and gone down. But at the date of confirmation, there was a court-appointed appraisal for $1.2 million, Your Honor. Of that, I'm sorry. I'm sorry. I was just going to comment that of that, only one-half of the equity interest would have been available. It was held in joint tenancy, and there's some details in there. But the bottom line, about $1.2 million. And the only thing really at stake is Mr. Harbin's interest in that house. What would happen to Mr. Sherman's claim if the plan is confirmed and then now we know that the state appellate court has reinstated the verdict? Yes, Your Honor. And what should have happened is that this appeal should have been denied, the plan should have been affirmed, and then remanded to the bankruptcy court. And there's no doubt that then Mr. Sherman would have the ability to come in under 9024 and 502J and seek reconsideration of his claim. Would it be discharged in bankruptcy? I mean, would he? We believe it would, Your Honor. And that's the position we absolutely intend to take. He has the argument that it has not been discharged. That argument hasn't been made, and it's not ripe for adjudication. It hasn't been teed up in any place. The district court did ask the same question, and so we've examined it. Our opinion is it's discharged. However, he retained the ability under Section 9024 to come in and reinstate his non-dischargeability claim. So if he can prove grounds for non-dischargeability under the bankruptcy code, it's Katy, bar the door to that house. He can come after Mr. Harbin if he succeeds on those. So there is procedure in process for each of Mr. Sherman's complaints, but feasibility is on one of them. This is a feasible plan. There's $140,000 sitting there, and there are $140,000 in allowed claims. This appeal never should have been brought. The mistake that Judge Moskowitz made was just he should have just affirmed the plan and remanded it to the bankruptcy court for reconsideration of this. There were just no grounds to vacate the plan on feasibility. What can be done now to assist Mr. Sherman's obviously legitimate claim? Well, Your Honor, I believe that the thing should go back to the bankruptcy court with a confirmed plan so that Mr. Harbin can pay his creditors pursuant to the feasible and confirmed plan. Mr. Sherman has the right to come in under 9024, have his claim reconsidered, have an order entered for the claim. 502J says that he will be paid up to the amount of his claim, the funds available, and the bankruptcy estate until his claim is equal. That's probably a meaningless remedy, frankly. I was going to say, that doesn't really get him anywhere. Yes, Your Honor. If he can prove non-dischargeability, he's got a judgment that's free and clear of the bankruptcy, and he can do whatever he wants with the remaining assets that were revested properly under Section 1141 and Mr. Harbin pursuant to the plan and pursuant to the bankruptcy code. If he can't prove it, he's out, and that's just the way it is. And in the end, Your Honor, bankruptcy is a two-edged sword. This debtor has spent substantial time and effort in bankruptcy, has had to propose three different plans, get one confirmed, has contributed exempt assets to the payment of other creditors to get this plan together, and in that he has a shot at keeping this house free and clear of Mr. Sherman's claim. What Mr. Sherman wants is the best of every world. He wants to hold him in bankruptcy, but he doesn't want to live with the consequence of the bankruptcy, and it is undecided whether his claim, whether they can show that it's not dischargeable or whether he should be exempt from the effect of 1141. But I would submit that that claim has not been brought, and that issue hasn't been decided yet. And it's not right. It's just not there yet. This should be back to Judge Hargrove with a confirmed plan to take that argument  That's the basic. That's where the case should be, Your Honor. At the time that the bankruptcy court was considering the plan, this 1129 said that the bankruptcy court had determined that confirmation of the plan is not likely to be followed by the liquidation, et cetera. Why was the bankruptcy court correct in light of this pending appeal? Explain to me how that works, and that follows up on this Rooker-Feldman issue. Yes, Your Honor. Chapter 11 was billed for corporations. It was billed for corporate entity debtors that go into bankruptcy, and the feasibility requirement is one that says, look, when this corporation, which has no assets other than what it can bring in and potentially no existence beyond this legal fiction of the corporation, its accounts, and its operations, if that company doesn't account for an expense that will have to be paid in the future, this is pizza Hawaii in those cases, then if there aren't adequate funds that we know that this plan can be paid as it's written, then it's not feasible. It's different from a corporate debtor or an individual debtor who has just assets on his own. John Harbin will never cease to exist until he dies and has his estate out there. He will have his house. The property revests in him by operation of the bankruptcy code, and so he will have assets from which a judgment could be satisfied. So there's a little bit of a disjoinder as to how a feasibility requirement can apply to an individual debtor who will undoubtedly have earnings and property in the future, whereas a corporate debtor, one isn't ever entitled to a discharge under the bankruptcy code. There's different treatment for corporate debtors, but the reorganization and liquidation requirements of 1129A11 are really more suited to corporate debtors. Well, they are, but they applied here, didn't they? They do, Your Honor. And so we still have to decide whether the bankruptcy court was correct in stating that the confirmation was not likely to be followed by the need for further financial reorganization. Yes, Your Honor, because it's not necessary to come back into bankruptcy and reorganize. At that point, an asset can be sold. Things can be taken. He could be garnished. His property could be levied upon. His wages could be garnished. That's not necessarily a reorganization. Mr. Sherman makes the argument that it's reciprocal or likely to be followed by a reorganization. That's not true. What does likely mean in that context? Is it likely that a judgment will be reversed or isn't it? I don't know, Your Honor. I think what his point was that if he succeeded on appeal, there would have to be a reorganization. Well, not necessarily. He could just come and take all the property. It comes out about that. Yes, yes. But that doesn't make it not feasible for the purpose of the bankruptcy code. The bankruptcy code is focused properly on the plan. And can this plan be implemented? That's the dictionary definition of feasibility, and it's consistent with this. We had enough money to pay the allowed claims. There are specific mechanisms under the bankruptcy code to handle Mr. Sherman's problem, which is not feasibility. Didn't the pizza case, didn't that involve a contention claim? The pizza case? Yes, Your Honor. And if I may, this is probably an important point, and it may be unique to the people who have to deal with bankruptcy all the time. I don't know. But those were contingent claims that were not liquidated. But does the feasibility determination turn on that? Section 1129, whatever it is, 11, doesn't talk about contingent or not contingent. It talks about feasible in light of future, potential future activity, without regard to whether that future activity involves things that are presently contingent. Yes, and that's exactly what 502C of the bankruptcy code does deal with, and that's estimation of contingent or unliquidated claims. Which they're not asking for. No, but that was the only mechanism, Your Honor. And I don't know why they didn't ask. Well, I have an idea. I think Rooker Feldman prevented the court from estimating something contrary to an existing state court judgment. But it begs the question is if the bankruptcy court did set out to estimate it, what would they estimate it at? Would he look at the state court's estimation? No, he wouldn't. He would not confirm it because it's not feasible until they know the outcome of the appeal. That's what they're saying. And that's what you can't do, Your Honor. You can't withhold confirmation until the last possible question has been answered about every claim. Some of these cases have thousands. But you can if it's not presently feasible, whatever that means. But that's circular, Your Honor. Yes, the problem is that you could have thousands of creditors in a bankruptcy case, and it can go on for years. At some point, the debtor is entitled to reorganize. And the mechanisms are in the bankruptcy code for reconsideration of those claims. The fact that there's a consequence that Mr. Sherman doesn't like to the confirmation of the plan, we didn't make Rooker Feldman up. We didn't make 502J up. It's there. That's what's in the system to deal with these claims. And this plan is feasible. I mean, it's just on its face feasible. They're complaining more about a later due process question that hasn't been raised yet, Your Honor. I see that I'm down to two minutes. And I apologize because I've given Mr. Zorro no time to talk about the IndyMac Bank issue and the non-pro-tunk refinance. I'm not sure how the Court wants to handle that. Well, you can have the rest of the time. Or did you just set it for my time? No, no. That was the total time. But you can have the rest of it if you'd like. I thought the counsel was going to speak. No, your side and then his side. That's what I thought you were doing. What I had intended, Your Honor, and I apologize, we got caught up in the questioning, was we have two different issues. I know you do. And he could respond. I mean, I guess we could let Mr. Johnson talk about it. Sure. Let's do that. But you don't have much time left. He's actually appealing the order in favor of my opinion. Correct. Okay. So it's your turn, but you only have about two minutes for your piece of it because we took most of the time on the other issues. Well, as I said, I'd like to reserve two minutes. You'll have to speak louder, sir. I'd like to reserve two minutes to respond to whatever Mr. Zaro says. May it please the Court, Your Honors. Larry Johnson. I'm from Long B. Isaacson Associates on behalf of Jeffrey Sherman. And, Justice Graber, I am glad that you didn't understand how Rooker-Feldman had anything to do with this case because, quite frankly, I didn't either. We never asked the Court to collaterally attack any judgment. We asked the Court repeatedly. Well, the case skates sort of on the edge of Rooker-Feldman, doesn't it? At least the policy of Rooker-Feldman is the recognition of state control over state judgments. And if you're going to enter something in a bankruptcy schedule as being zero-zero and it has some other value according to the state courts, you get into the Rooker-Feldman or vice versa. No, I don't think so. I don't see where that's necessarily cut. You know, I don't see that the whole case depends on this technical application of Rooker-Feldman anyway. My main question, I'd like to ask you, what should the bankruptcy judge have done in this case? I think, reading your briefs, that what he should have done is kept the case open forever until the last court of which, I guess, the Supreme Court could rule on this claim, which would have been a long time. And your concern is with one creditor, and that one creditor has rights. But other people have rights in this matter as well. There are other creditors, and there's a house involved, and the bankruptcy judge had to balance all these considerations. Now, what should he have done? I'll try to answer that with giving you a little bit of a reminder of the history of the case. The court described this as a two-party dispute. The rest of the creditors he really considered to be incidental to this actual two-party dispute between Sherman and Harbin. The court granted us relief from stay so that we could liquidate our claim in the California Court of Appeal. On the date of confirmation, we had already submitted our opening brief on appeal to the California Court of Appeal. The court knew that. The court also was informed that the briefing schedule would be relatively expedited, perhaps, compared to the federal courts of appeal. And it was likely — No offense taken. I'm sure your courts are very busy and that your calendars are controlled as efficiently as possible. But the California law actually required that there will be oral argument within 30 to 90 days, typically, of when the briefs are submitted. The court of appeal is required to render a decision within 90 days of that being submitted. We were not looking at a year or two. We were looking at months. He kept the case open for 18 months, didn't he? There were things he could have done. He could have — he should have refused to infirm the plan because it was not feasible, because it was likely to be followed by a future reorganization that was not proposed in the plan. I wasn't likely to be followed by anything. What? You're just betting you're going to win this appeal. I don't know whether that's likely or not. Well, I think that if you read the court's comments on December 11th, he seemed to assume we were going to win our appeal, because he talked about you will have state court remedies. Was he evaluating the Rooker-Feldman doctrine when he does that? No, he wasn't, Your Honor. He was evaluating the — He's objecting the judgment of a trial court and saying it ought to be reversed on appeal and conducting himself according to that evaluation. Isn't that — No, he was not. — a verge upon the Rooker-Feldman doctrine? No, he has to make a determination. What will happen in the future, what is likely to happen in the future — He knew the issue was a jury had issued a verdict. He knew that that was on appeal. He knew that we had submitted to him our brief showing that the trial judge in that case said to the jury, this is yours and yours alone. And then when they issued a verdict the judge didn't like, he decided not to follow them, and there was no basis in law for that. Well, it sounds like he's second-guessing the state court when he went through all those — No, what — — mental gyrations. Judge Hargrove didn't make any determination on whether it was likely to be followed. His factual findings were he's paying $112,000, he has the $112,000. He did not even analyze whether it was likely to be reversed on appeal, but he said in the event it is reversed on appeal, you will have the same rights as if Harbin had never filed bankruptcy, which means you'll have the right to try to collect on your debt outside the purview of the court, which means it was not a proposed plan that was described in the plan. And this all occurred in the context of the court telling everybody there is a way to do some form of a pro rata interim distribution. There is a mechanism to provide in the plan that Harbin will maintain the property in the estate so that it will not be subject to him selling it, hypothecating it, transferring it, encumbering it, hiding it. He discussed that. They proposed, their first plan proposed the very thing that would have made this plan more likely to be feasible. They proposed initially that they would withhold a pro rata share just in case they lost the appeal. They told the court orally on multiple occasions, we will propose a plan where John Harbin will maintain this property in the estate so that it will be protected in case he loses the state court appeal. Then they get to their second amended plan, and they throw all that out the window, and they say, no, his claim has been disallowed, so he gets no treatment. And the court's factual finding was there's no mention of Sherman in the plan. Mr. Johnson, Mr. Leeds reads the 112911, the liquidation or further financial reorganization, as being applicable to a corporation only, not to an individual in this case. How do you read that language? Should the bankruptcy court have thought that this pending appeal would make it likely that the plan could be followed by liquidation or need for a future further financial reorganization? That language in 1129A11 applies to all debtors proposing a Chapter 11 plan. I believe that the cases that have analyzed the statute have said there may be a slightly different standard between an ongoing corporation and a liquidation plan. But in this case, the plan was I will liquidate, and then nothing said at all about what will happen if I'm forced to liquidate again. And let's not forget, John Harbin only entered into this bankruptcy because of the state court verdict. And once that makes it very likely that if the court of appeal did what it actually did, that he would be right back where he was, needing a liquidation. And that liquidation was not proposed in the plan, was not supervised by the court, and the judge was basically saying you kept him in bankruptcy so you don't get the benefit of the bankruptcy. And when Mr. Leeds was talking to this court, he talked about, well, there are debtors' rights, there are creditors' rights. We were in there as a party in interest trying to preserve our rights to make sure that Mr. Harbin didn't dissipate the assets. And we know from this history that he would have done that because he lied in his initial application, said his house in Coronado, California was worth $825,000, and we showed the judge it was worth over $1.1 million. He tried to sell the house to his wife for $1,025,000. At the same time, the bank appraised it at $1.2 million and then told the court with a straight face, there's no way my house is worth $1.2 million. He went in and did an illegal refinance of the loan, knowing as a bankruptcy attorney he could not do it, so that he could take money out of the house. If he went on appeal and the case was sent back, presumably your client would have been made whole, wouldn't he? There's a lot of money in the bankruptcy estate. The main problem that prevented that from happening is that the court said this property vests in the debtor, and the day after the effective date he could have sold it to his wife at a discount, he could have done anything, taken out another refinance loan and hid the assets somewhere else. John Harbin is doing everything in his power to not pay this debt, and it's now been adjudged by the courts in California that he owes more than $594,000. With interest, it would be $694,000. That is over 84% of the claims that he listed. When you add our claim back in, it's 84%. And to say I'm going to give everybody else 100%, and if you win your appeal, you get whatever happens to be there, if it's 10% or 20%. You're not giving fair treatment to the largest potential creditor and somebody who was never finally fully disallowed. The court always said, I'm only doing this and reserving all of your rights so that you can come back when you win your appeal, if you win your appeal. Your Honor, at the hearing, we specifically had the U.S. trustee and our office ask the judge to make sure that the plan said, this debt is not discharged. The court said twice in that hearing, right, it's not discharged. Then he signs an order over our objection saying it is discharged. The ripeness is it goes also to the feasibility and the fairness of this plan, and it shows that this is an issue that should have been a reason for the court to have not signed that order, because it contradicted the very statements the court made on the bench on the day of the hearing. So I'd like to now direct some attention to the motion for non-protonc approval as well, unless there are any other questions on this issue. The problem with this non-protonc motion is there's not anything in the Ninth Circuit that has actually said what is the standard for determining if a motion for non-protonc approval of a finance should be done. And in the lower court, we were all kind of struggling with what is the test. We have cited the cases, Blessing Industries, for instance, where they said you cannot just come in and say I was negligent. You can't just come in and say, well, I made a mistake. There has to be something extraordinary in the circumstances. You have to explain why you didn't get the loan approved before it was issued. And in this case, the evidence came in very clearly that John Harbin, a bankruptcy attorney, knew he had to get bankruptcy court approval. He ignored the law because he wanted to get a favorable loan, probably so he could propose the plan that he did propose to harm Sherman. And IndyMacBank had noticed in the preliminary title report that he was in bankruptcy. The test, Your Honor, that needs to be set forth is that a lender has to take the risk. If they don't investigate whether or not a borrower is in bankruptcy or the bankruptcy court approval is there, that is their fault, and they should have to be suffering for it. The district court, I think, cited the Atkins test, and then the American Cooler test was also cited. Are you saying those are not the correct tests? Yes, I am. I am, because the Atkins case involved a professional being employed. It didn't involve a nunk-pro-tunk motion for approval of refinance. We have a better test, which would be, for instance, Gloria Manufacturing, which is one that talked about what would happen. In that case, the trustee gave a loan on the day that payroll was due to a debtor so that the company would stay in business. It was an emergency. That, I think, would rise to an extraordinary circumstance, and that got approval. But in this case, it was February 2003. The court had just denied a motion to sell the property, and there was no reason for the court at that point to have approved a nunk-pro-tunk motion. So the court would have denied it. Are you saying that the court applied the wrong legal standard, even though there's not a legal standard expressly? There's not a Ninth Circuit precedent, but there are other cases that talk about neglect does not rise to an extraordinary circumstance, and I think that those other cases should apply the correct legal standard. I think that the standard that the judge adopted was incorrect, and I'd like to reserve the rest of my time to respond to whatever Mr. Zarles said. He doesn't have much time, but you don't either. Good morning. David Zarro on behalf of IndyMac Bank. Obviously, IndyMac is not a party to this rather bitter and rancorous dispute between Mr. Harburn and Mr. Sherman. I think what's important to note is, in fact, the Atkins case does set forth the standard for nunk-pro-tunk decision-making by the court in the Ninth Circuit, and that test, which isn't the exclusive test that the court can use, as Atkins states. The court can also apply the – so it can apply the Atkins test as being the primary test, which is – simply calls for IndyMac to make – show two things. One, that IndyMac can satisfactorily explain why it came to be that it made a loan without bankruptcy court approval. And two, that it demonstrate that its services or what it provided to the bankruptcy state was of value. The court also indicated in that case that the court might apply – the court may look to other elements of – and it looked to – note, I think the name of the case is the Twining case or the Twining case in Tennessee, which enumerated a number of factors. And the fact is that we've laid out in our briefs very clearly the actual evidence, and I draw your attention to the declaration submitted by IndyMac by Ms. Molly Graham, by Mr. Moore, and Ms. Perez, that IndyMac, first of all, can explain its lack of knowledge of this – or lack of seeking of a motion to approve finance because it had no knowledge of the bankruptcy. It had no constructive knowledge. It had no inquiry knowledge. It just simply had no actual knowledge. Remember, its borrower was not this Mr. Harbin. It was Mr. Harbin. The only inquiry knowledge that this – under the standard set forth by Mr. Sherman, a bank is not permitted to lend money to a married woman without looking into the finances of her husband. We certainly think that's not the standard that's before this court. In fact, as Ms. Graham states in her declaration, it likely violates the Equal Opportunity – Equal Opportunity to Credit Act that the bank tries to ascribe to. So from that standpoint, I think the bank has – that the motion should be affirmed, the order from the lower court should be affirmed, and that the bank should be left in place with its deed of trust. Thank you, counsel. Last but not least, we're – Your Honor, I – Rebuttal. I would point out the law should impose a duty on a lender to make an inquiry into whether or not they can issue a loan. What they conveniently forget to emphasize is Mr. Harbin was on title until the day the loan funded. And if they were looking at this loan and saying there are two people on title, can we issue this loan? And if they would have said, has either of them filed bankruptcy, they would have found out. They chose not to. The broker that was handling the deal clearly knew that Mrs. Harbin was borrowing this money because her husband was in bankruptcy, and they should be charged with the knowledge of that. What they're saying is, let us violate the law, and in the process say we honestly thought we weren't violating the law. And then the law becomes irrelevant, because every lender in this country would then say, well, we just won't ask if anybody's in bankruptcy, we'll do the loan, we'll make our profit, and then we'll tell the court, we honestly believed we could do it. That would destroy the law. Everybody would then fall into that exception. And that is the reason that cannot be the test. The test has to be there was something extraordinary, some emergency, some compelling reason you could never satisfy that test. And in so doing, they are trying to get this court and they got the bankruptcy court to completely eviscerate the entire meaning of 364 that requires prior approval before these loans are issued. So I'd ask the court to reverse the court, the bankruptcy court on both issues, and affirm the district court on its reversal of the Chapter 11 plan confirmation, and reverse it on its final protonc motion. Thank you, Your Honors.
judges: Cudahy , Graber, Ikuta